## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **MINERALS DEVELOPMENT & SUPPLY COMPANY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-CV-488** |
| | ) | |
| **HUNTON & WILLIAMS LLP,** | ) | |
| **INSIGHT EQUITY HOLDINGS LLC,** | ) | |
| **and** | ) | |
| **INSIGHT EQUITY LP,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## HUNTON & WILLIAMS LLP'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### I.    INTRODUCTION

A lawyer will often incur the wrath of his client's adversary or competitor.    Without more, a lawyer's representation of his client is no tort. And "more" is what is obviously and inescapably missing from the Complaint of Minerals Development & Supply Company, Inc. ("MDSC").  MDSC has sued Hunton & Williams LLP ("H&W"), a law firm, solely for representing H&W's client, Superior Silica Sands LLC ("Superior Silica"), MDSC's competitor.

Essentially, the Complaint alleges that MDSC had a contract to buy frac sand from Wildcat Companies II LLC ("Wildcat") and sell the sand under a different contract to Superior Silica.  H&W represented Superior Silica when Wildcat and Superior Silica began to negotiate their own contract after Superior Silica had terminated its contract with MDSC.  After Superior

Silica learned that the Wildcat-MDSC contract might prohibit Wildcat from dealing with Superior Silica, H&W, on behalf of Superior Silica, notified Wildcat that Superior Silica would stop negotiations until Wildcat provided assurance that Wildcat was legally free to negotiate with Superior Silica.  Wildcat terminated its contract with MDSC, and MDSC now blames Superior Silica's counsel, H&W, for tortious interference, aiding and abetting tortious interference and conspiracy in violation of Section 134.01 of the Wisconsin Statutes.   MDSC has not pled—and cannot honestly, much less plausibly, plead—any of the facts necessary to elevate H&W's conduct from client representation to tort.

Nearly a century ago, the Supreme Court of Wisconsin ruled that in view of the "*quasi-judicial office*" they occupy, attorneys should be immune from suit by third parties for the actions they take on behalf of their clients. *Langen v. Borkowski*, 206 N.W. 181, 190 (Wis. 1925).  So long as the attorney acts for his client in good faith, without fraud or specific intent to harm, and does not subvert the administration of justice, the attorney is immune from liability to third parties, even "if it subsequently is determined that the position taken by him was erroneous." *Id.*

MDSC does not allege that H&W aided in the evasion of a court order or otherwise subverted the administration of justice.  MDSC does not allege that H&W had any animus towards MDSC, committed any fraud, or acted for the purpose of harming MDSC.  To the contrary,  MDSC alleges that "[a]t all relevant times the Hunton firm represented Superior in matters concerning both of these Contracts," that the acts about which MDSC complains were acts undertaken by H&W "as attorneys for Superior," and that these actions were taken "to the benefit of . . . their client, Superior."   Complaint ¶¶ 11, 17, 36.  This Court should therefore

dismiss all three counts of the Complaint against H&W for failure to state a claim upon which relief can be granted.

Alternatively, there are independent grounds for dismissing each count. Count I fails to state a claim for tortious interference with contract because the Complaint fails to plausibly allege that H&W induced Wildcat to terminate its contract with MDSC. And in any event, Superior Silica's refusal to deal with Wildcat after learning that Wildcat allegedly was contractually constrained from dealing with Superior Silica cannot be tortious. Count II states no claim for aiding and abetting because Count II fails to allege that either Wildcat or H&W's client, Superior Silica, committed any tort or unlawful act. There is no cause of action for aiding and abetting breach of contract. Finally, Count III states no claim for conspiracy both because the Complaint alleges no plausible facts to remove H&W from the general rule that an agent cannot conspire with its principal, and because the Complaint fails to plausibly allege the malice required to state a claim for conspiracy pursuant to Wis. Stat. § 134.01.

## II.    STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the plaintiff's allegations must "raise a right to relief above the speculative level" and "state a claim that is plausible on its face." *Rao v. BP Products North America, Inc.*, 589 F.3d 389, 398 (7th Cir. 2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550, 127 S.Ct. 1955 (2007)); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)). In evaluating the sufficiency of the complaint, a court will "construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the plaintiff's] favor." *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 763 (7th Cir. 2010) (citation omitted). But courts need not accept as true "'legal conclusions [or t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (*quoting Iqbal*, 129 S.Ct. 1937).

Legal conclusions "must be supported by factual allegations." *Tocholke v. Wisconsin*, Case No. 09-C-1125, 2010 WL 2430999, *1 (E.D. Wis. June 14, 2010) (*quoting Iqubal*, 129 S.Ct. at 1950). To the extent that factual allegations conflict with a legal conclusion, "the factual allegations are decisive." *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (citations omitted).

A court also need not accept as true allegations that are "so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim." *Brooks*, 578 F.3d at 581. A complaint "that offers 'labels and conclusions … will not do.'" *Tocholke*, 2010 WL 2430999 at *1  (*quoting Iqbal*, 129 S.Ct. at 1949). The Seventh Circuit has held that dismissal was appropriate where the complaint restated the elements of a RICO statute "in boilerplate fashion" without including sufficient facts underlying the statutory elements. *Rao*, 589 F.3d at 399 (*citing Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Similarly, the Seventh Circuit has upheld the dismissal of a complaint where the conduct alleged was "just as consistent with lawful conduct as it is with wrongdoing" and, therefore, did not put the "defendants on notice of what exactly they might have done to violate [the plaintiff's] rights under the Constitution, federal law, or state law." *Brooks*, 578 F.3d at 581-82. Such allegations paired with "merely a formulaic recitation of the cause of action and nothing more," according to the Seventh Circuit, are not enough to survive a motion to dismiss. *Id*. at 582.

For purposes of a motion to dismiss, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (citations omitted). This is true whether, under Fed R. Civ. P. 10(c), the plaintiff has attached the documents to the complaint as exhibits or has chosen

not to do so.  *Id.* (citation omitted) (holding that it was proper to consider seven documents that the defendant attached to a Rule 12(b)(6) motion to dismiss, because the plaintiff referred to the documents in its complaint and they were central to the claims at issue).

## III.   THE COMPLAINT

H&W is a law firm whose "primary business is to provide legal services to clients." Complaint ¶ 2.  MDSC's Complaint against H&W is a regrettable offshoot of a commercial dispute MDSC has with another party that is represented by H&W.

That other party, Superior Silica, had a contract to buy sand from MDSC.  Complaint ¶ 8. MDSC in turn had a contract to buy sand from Wildcat Companies II LLC.  Complaint ¶ 10. "At all relevant times the Hunton firm represented Superior in matters concerning both of these Contracts."  Complaint ¶ 11.

On or around August 1, 2009, Superior Silica terminated its contract with MDSC. Complaint ¶ 12.  Following termination of its contract with MDSC, Superior Silica needed a different source of sand.  Accordingly it commenced negotiations with Wildcat.  *See* Complaint ¶¶ 12-20.  In those negotiations, Superior Silica was represented by H&W, who acted "as attorneys for Superior" and "as counsel for Superior."  Complaint ¶¶ 17, 41.

In its capacity as Superior Silica's lawyers, the Complaint alleges, "Defendant Hunton and its attorneys were the driving force" behind Superior Silica's terminating its contract with MDSC and then "forcing" Wildcat to terminate its contract with MDSC.  Complaint ¶ 28.

According to the Complaint, "[a]ttorneys at the Hunton firm were pervasively involved in advising Superior with respect to every aspect of its involvement in the old and new supply chains" for sand.  Complaint ¶ 43.  The Complaint also alleges that the H&W lawyers "were directly involved in Superior's efforts to obtain insurance and funding for its operations . . . ." Complaint ¶ 46.

The Complaint describes the steps allegedly taken by H&W during the negotiations. According to the Complaint, "the Hunton lawyers notified Wildcat's counsel," took "positions" with Wildcat, "sent a letter to Wildcat's attorney," and engaged in efforts "to convince Wildcat." Complaint ¶¶ 13, 15, 16, 17. The Complaint further alleges that "through the assistance of their attorneys at Hunton," Superior Silica was able to enter into a sand supply contract with Wildcat. Complaint ¶ 20. This new contract, according to the Complaint, "was based on the collective collusion and effort of the defendant Hunton and its client, Superior." Complaint ¶ 47.

The Complaint also explains that H&W's motivation and goal was to represent the interests of its client Superior Silica. According to the Complaint, "Sean Ducharme, Jeffery Edwards, Kimberly Magee, and numerous other lawyers with Defendant Hunton & Williams, LLP" acted "systematically . . . *to the benefit of* their firm and *their client*." Complaint ¶ 36.

The Complaint does not allege::

- that termination of the Superior Silica-MDSC contract or the MDSC-Wildcat contract benefitted H&W;

- that H&W had any animus toward MDSC; indeed, the Complaint does not allege any relationship of any kind between H&W and MDSC;

- that H&W acted for the specific purpose of harming MDSC;

- that H&W defrauded MDSC; or

- that H&W engaged in any action contrary to the administration of justice or violative or evasive of a court order.

Nor does the Complaint allege any facts from which the Court can plausibly infer any of these omitted points.

## IV.     GROUNDS FOR DISMISSAL

MDSC's Complaint fails to state a claim upon which relief can be granted for several independent reasons.  First, as counsel for Superior Silica, H&W enjoys a qualified privilege against tort liability.  Because the Complaint fails to allege any plausible facts to overcome that privilege, the Court should dismiss Counts I, II, and III.

Second, Count I also fails because the Complaint fails to plausibly allege that H&W tortiously induced Wildcat to breach its contract with MDSC.  The communications pleaded in the Complaint plainly establish that H&W did not demand that Wildcat terminate its contract with MDSC.  Rather H&W merely communicated that its client, Superior Silica, refused to deal with Wildcat if Wildcat had any contractual restriction prohibiting such dealing.

Third, Count II states no claim for aiding and abetting because Count II fails to allege that either Wildcat or H&W's client, Superior Silica, committed any tort or unlawful act.  There is no cause of action for aiding and abetting breach of contract.

Finally, Count III states no claim for conspiracy because the Complaint does not plausibly allege that H&W acted outside of its attorney-client relationship for its own purposes and, therefore, as an agent/attorney, H&W could not conspire with its principal/agent.  Alternatively Count III fails to plausibly allege the malice required to state a claim for conspiracy pursuant to Wis. Stat. § 134.01.

### A.     HUNTON & WILLIAMS' QUALIFIED PRIVILEGE PRECLUDES MDSC'S CLAIMS

All that appears from the Complaint is that H&W worked closely with its client in keen pursuit of the client's interests.  What is omitted from the Complaint is fatal to MDSC's claims.  Quite simply, the Complaint is wholly lacking in the kind of allegations required under Wisconsin law to overcome H&W's qualified immunity.

Lawyers acting within the scope of an attorney-client relationship enjoy a qualified immunity against suits by disgruntled non-clients.  *Green Springs Farm v. Kersten*, 401 N.W.2d 816, 823 (Wis. 1987) (recognizing "the general rule in Wisconsin [] that an attorney could not be held liable to third parties for any acts committed within the scope of an attorney-client relationship" unless the attorney's conduct was fraudulent to the nonclient), *citing Scandrett v. Greenhouse*, 11 N.W.2d 510 (Wis. 1943), and *Goerke v. Vojvodich*, 226 N.W.2d 211 (Wis. 1975); *Langen v. Borkowski*, 206 N.W. 181 (Wis. 1925) ("An attorney is immune from liability to third parties so long as the attorney pursues in good faith his or her client's interests on a matter fairly debatable in the law"); *see also Bersch & Co., S.C. v. Dairyland Greyhound Park, Inc.*, 520 N.W.2d 290, (Wis. Ct. App. 1994) (acknowledging "the general rule that an attorney may not be held liable to third parties for any acts committed within the scope of an attorney-client relationship").  So long as the lawyer acts to further the interests of his client and does not defraud the third party, he cannot be liable for tortious interference.

This qualified immunity or privilege is necessitated by the attorney's integral role in obtaining the proper administration of law and justice, lest attorneys act without the "fearlessness and courage" for their clients on which our society relies.  *Langen*, 206 N.W. at 190.  *See also Cotton v. Private Bank & Trust Co.*, 2004 U.S. Dist. LEXIS 4001, *17-*18 (N.D. Ill. 2004) (holding that an attorney cannot be held liable for tortious interference unless the attorney "induced the breach to further their personal goals or to injure the other party to the contract;" and stating that "Public policy requires that an attorney, when acting in his professional capacity, be free to advise his client without fear of personal liabiltiy to third persons if the advice later proves to be incorrect"); *Macke Laundry Serv. L.P. v.Jetz Service Co.*, 931 S.W.2d 166, 181 (Mo. Ct. App. 1996) ("'If attorneys cannot act and advise freely and without constant fear of

being harassed by suits and actions at law, parties could not obtain their legal rights'") (citation omitted); Restatement (Third) of the Law Governing Lawyers § 51 comment b ("Making lawyers liable to nonclients . . . could tend to discourage lawyers from vigorous representation").

Consequently, the attorney's qualified immunity is not easy to overcome: it takes a concerted subversion of the public interest, actual fraud on the nonclient, or conduct undertaken for the specific purpose of harming the nonclient.  *Tensfeldt v. Haberman*, 768 N.W.2d 641 (Wis. 2009), demonstrates the kind of conduct necessary to overcome the qualified privilege. In that case, the defendant lawyer for the testator drafted a will that he knew violated a court decree in the testator's divorce proceeding.  In most other cases, the Wisconsin Supreme Court noted, an attorney is immune from liability to third parties.  *Id.* at 656, *citing Yorgan v. Durkin*, 715 N.W.2d 160 (Wis. 2006).  But in *Tensfeldt*, there was "no question that [the lawyer] intended that the will would violate the judgment.  He was aware of the court's judgment and knew that the will he drafted violated it."  *Tensfeldt*, 768 N.W.2d at 649.

Indeed, *Tensfeldt* distinguished the attorney's wrongful conduct from the type of allegations made in MDSC's complaint.  In response to the accused attorney's citation of qualified immunity cases from other jurisdictions, the Supreme Court of Wisconsin observed that "[n]one of these cases involves the client's commission of an unlawful act.  *Instead, they involve the client's breach of a contract or fiduciary duty*."  768 N.W.2d at 657 (emphasis added).

MDSC's allegations fall well short of the gross misconduct required to overcome H&W's qualified privilege. In fact, MDSC's affirmative allegations remove any doubt that H&W acted within the scope of its attorney-client relationship with Superior Silica and solely to further the interests of its client when it represented Superior Silica in its negotiations with Wildcat. MDSC alleges that "*[a]t all relevant times* the Hunton firm represented Superior in matters

9

concerning" the Superior Silica-MDSC and the MDSC-Wildcat contracts.  Complaint ¶ 11
(emphasis added).  MDSC further alleges that "*[a]s counsel for Superior*, the attorneys at
Hunton were able to convince Wildcat to terminate their existing contract with MDSC,
the Wildcat Contract, on August 14, 2009."  Complaint ¶ 17 (emphasis added).  In short, the
Complaint expressly avers that in its interactions with Wildcat, H&W was acting as counsel for
Superior Silica.  The Complaint makes no allegations of any fraud by H&W against MDSC.
Indeed, since the acts about which MDSC complains are acts directed by H&W exclusively
towards Wildcat, MDSC cannot plausibly allege that those acts constituted a fraud as to MDSC
or anyone else.  Nor does the Complaint allege that H&W acted with the specific purpose to
harm MDSC.  To the contrary, the Complaint alleges no motive for H&W actions other than
service to its client Superior Silica.  MDSC does not even allege that any lawyer at H&W ever
dealt in any way with any employee of MDSC.

Perhaps MDSC will contend that it has alleged facts sufficient to raise a question about
the applicability of the qualified privilege by asserting that, "[b]ased upon information and
belief, Hunton's demand that Wildcat terminate its contract with MDSC, the Wildcat Contract,
was done without authority from Superior."  Complaint ¶ 21.  But such an argument has no merit
because acting without authorization is not one of the kinds of misconduct that the Wisconsin
courts have recognized as sufficient to take a lawyer's act outside the qualified privilege.  In any
event, this bald conclusory allegation is supported by no other allegations in the Complaint and is
implausible on its face.  *Brooks*, 578 F.3d at 581 (court not required to accept as true allegations
that are "sketchy or implausible"). MDSC cannot have it both ways: it cannot simultaneously
allege that H&W was "pervasively involved" and in "collective collusion" with its client while

10

"systematically" working for the client's benefit and at the same time allege that H&W was engaged in conduct not authorized by its client and wholly unrelated to Superior Silica's welfare.

Given the express allegations that H&W acted on behalf of, and to the benefit of, its client Superior Silica, and absent allegations that H&W acted to defraud MDSC or for the specific purpose of harming MDSC, MDSC cannot state a claim for relief against Superior Silica's lawyers on any of its three counts. *Cf. George A. Fuller Co. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1333 n.6 (7th Cir. 1983) ("mere allegations of 'malice,' unsupported by any facts which show that defendants acted without justification or privilege, does not state a cause of action for tortious interference"); *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991) (where defendant possessed qualified privilege, claim for tortious interference did not state a cause of action against defendant in the absence of allegations "that the defendant's actions were 'unjustified or malicious'").

### B. COUNT I DOES NOT STATE A CLAIM FOR TORTIOUS INTERFERENCE BECAUSE THE COMPLAINT DOES NOT ALLEGE THAT H&W DEMANDED TERMINATION OF THE CONTRACT AND A REFUSAL TO DEAL IS IN ANY EVENT LAWFUL

A claim for tortious interference can be made only against "[o]ne who, without a privilege to do so, induces another or causes a third person not to perform a contract . . . ." *Lorenz v. Dreske,*, 214 N.W.2d 753, 759 (Wis. 1974). As explained above, H&W has just such a privilege. But there is yet another reason why Count I does not state a claim. MDSC's tortious interference claim centers on the contention that H&W allegedly told Wildcat on two occasions to terminate its contract with MDSC. To the contrary, the communications at issue contain no such directive and do not constitute inducement for Wildcat's termination of its contract with MDSC a matter of law.

Count I rests on two communications attributed to H&W: (1) an email exchange between Wildcat's counsel and H&W on August 6, 2009, Complaint ¶ 13; and (2) an August 13, 2009

letter from H&W to Wildcat's counsel.  Complaint ¶ 16.  Copies of both are attached hereto as Exhibits A and B, respectively.[1]  As the Court can plainly see, these communications did not ask Wildcat to terminate its contract with MDSC.  These communications, accordingly, do not constitute inducement for Wildcat to terminate its contract with MDSC, meaning that this necessary element of a tortious interference claim is lacking. *Lorenz*, 214 N.W.2d at 759 (defining inducement as element of tortious interference); *see also* Restatement (Second) of Contracts § 766, comment n ("B is under contract to sell certain goods to C.  He offers to sell them to A, who knows of the contract.  A accepts the offer and receives the goods.  A has not induced the breach and is not subject to liability under the rule stated in this section").

       a.     <u>August 6, 2009 email</u>.  Wildcat asserts that on August 6, 2009, H&W "notified Wildcat's counsel that Wildcat must terminate its Contract with MDSC (the Wildcat Contract), if Wildcat wanted to do business directly with Superior."  Complaint ¶ 13.  But H&W's  email says no such thing.

      The email exchange was initiated when Wildcat's attorney, William Spangler, sent to Sean Ducharme (a H&W attorney representing Superior Silica) a draft letter of intent for their respective clients.  Ex. A, p. 1.  Spangler's email stated that the purpose of the letter of intent was to ensure that Superior Silica "is not out there trying to secure other providers for sand products in Wisconsin."  Spangler then noted that MDSC had threatened litigation against Wildcat and that during a meeting he (Spangler) had with Wildcat "[o]ne issue that came up is the timing of our contract termination with Kenin [Edwards, president of MDSC]."  The attached draft letter of

---

[1] The Complaint relies on these documents, and thus the Court may rely on them in connection with a Rule 12(b)(6) motion. *Venture Associates*, 987 F.2d at 432 ("the district court did not err in refusing to exclude [documents referred to in plaintiff's complaint and attached to defendant's motion to dismiss] nor in considering Zenith's motion as one for dismissal for failure

intent, prepared by Spangler, provided that Superior Silica "understands and acknowledges that Wildcat has certain pre-existing business contracts related to its extraction and production of frac sand that will need to be terminated and/or revised prior to entering into" an agreement with Superior Silica.  The draft letter of intent did not identify the contracts that Wildcat believed needed to be "terminated and/or revised," except to say that they were "certain pre-existing business contracts related to its extraction and production of frac sand."

Ducharme did not respond to Spangler's statement about termination of the MDSC-Wildcat contract.  Instead, Ducharme merely returned a redline of the draft along with a signed version of the letter of intent as revised.  Ducharme's revisions are notable.  None mentions MDSC, much less specifies that Wildcat must terminate its contract with MDSC.

Contrary to MDSC's allegation, Ducharme's response in no way notified Wildcat that it must terminate its contract with MDSC.  His response makes no mention of the Wildcat-MDSC contract at all.  Ex.A, p.1. The only reference to termination of that contract was initiated by Wildcat's counsel who volunteered a discussion he had with his client touching on that topic. *Id.* Moreover, as explained below, even if H&W had made such a demand on behalf of its client Superior Silica, the demand would not constitute tortious interference with the MDSC-Wildcat contract.

b.  <u>August 13, 2009 Letter</u>.  MDSC asserts that the August 13, 2009 letter said "that no further negotiations would occur until Wildcat confirmed it could negotiate without the restrictions of the pre-existing contract" and that any new contract between Superior Silica and Wildcat was "expressly contingent on the termination of the Wildcat Contract."  Complaint ¶ 16. Even if true, this allegation does not support a claim for tortious interference.  There is nothing

---

to state a claim rather than one for summary judgment"); *see also* Fed. R. Civ. P. 10(c) ("A copy

tortious in a party's insistence that its counterparty be legally free to deal.  *Cf. Brooks*, 578 F.3d at 581-82 (affirming dismissal of complaint where conduct alleged by plaintiffs "is just as consistent with lawful conduct as it is with wrongdoing").

In any event, the August 13 letter does not state what MDSC alleges.  Instead, it says in its entirety:

> As you know, Superior Silica Sands LLC (SSS) and Wildcat Companies II, LLC (Wildcat) have been discussing the possibility of entering into a business relationship for the sale and purchase of raw materials for the production of frac sand.  SSS entered into those negotiations based on Wildcat's representation, made at the outset of the discussions in response to a specific inquiry from SSS, that Wildcat had no contractual or other restrictions on its ability to enter into a supply contract with SSS.  When we learned yesterday, for the first time, that Wildcat might have a contract that restricts its ability to enter into a supply contract with SSS, we immediately halted those discussions.  You have now indicated that Wildcat can provide written assurance that Wildcat's existing contracts create no such restriction.  We look forward to receiving such assurance.  In the meantime, we reiterate that there are no commitments, obligations, or agreements of any kind between SSS and Wildcat, and that there can and will be none in the absence of receiving such assurance.

Exh. B., p. 1.

In deciding this motion to dismiss, the actual content of the letter takes precedence over MDSC's mischaracterization of it.  *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 529 (7th Cir. 1999) ("'a plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment'") (citation omitted); *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) (reaffirming the "well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations").

The letter does not mention termination at all.  Instead, the letter says that Superior Silica halted negotiations on learning that Wildcat's contract with MDSC might restrict Wildcat's

---

of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes").

dealings with Superior Silica.  The letter further observes that Wildcat said it could provide written assurance that its existing contracts did not impose such restriction, and states that Superior Silica would await receipt of such assurance before resuming negotiations.  Neither H&W nor its client Superior Silica requested that Wildcat cancel its contract with MDSC. The letter simply reflects Superior Silica's prudent request for assurance that Wildcat was legally free to do business with Superior Silica.

Equally important, Superior Silica's refusal to do business with Wildcat because of Wildcat's contract with MDSC is not an unlawful inducement to breach, as a matter of law. Refusal to do business with someone is not tortious interference.  Restatement (Second) of Torts § 766, comment b ("The rule stated in this Section [setting forth elements of tortious interference] does not apply to a mere refusal to deal.  Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability"); *Bruner Corp. v. Balogh*, 19945 U.S. Dist. LEXIS 22127, *38-*39 (E.D. Wis. 1995) (applying comment b and granting summary judgment to defendant on tortious interference claim); *see also Hale v. Stoughton Hosp. Assoc., Inc.*, 376 N.W.2d 89, 96 (Wis. Ct. App. 1985) ("We have adopted sec. 766 of the Restatement (Second) of Torts"); *Brunswick Corp. v. E.A. Doyle Mfg. Co.*, 770 F. Supp. 1351, 1364 (E.D. Wis. 1991) ("Wisconsin courts have adopted the Restatement (Second) of Torts with respect to tortious interference with contract claims").

An example in the Restatement (Second) of Torts addresses this very situation and makes clear that it does not constitute tortious interference with contract:

> Upon hearing of B's contract with C, A ceases to buy from B.  When asked by B to explain his conduct, A replies that its reason is B's contract with C.  Thereupon B breaks his contract with C in order to regain A's business.  A has not induced the breach and is not subject to liability to C under the rule stated in this Section.

Restatement (Second) of Torts § 766, comment l, illustration 1.

This principle is demonstrated by *Harman v. La Cross Tribune*, 344 N.W.2d 536 (Wis. Ct. App. 1984).  Harman worked as an attorney at the law firm that represented the La Cross Tribune. After Harman issued a press release claiming that the Tribune's editor had deliberately furnished false information for publication in violation of state law, the Tribune threatened to retain new counsel if Harman remained employed at the firm.  The law firm fired Harman. 344 N.W.2d at 541-42.  Nevertheless, the Tribune was not liable for tortious interference with Harman's contract with the law firm because the Tribune could properly refuse to deal with the law firm in these circumstances.  *Id.*

Here, the August 13, 2009 letter does not even go as far as the Tribune's statement in *Harman* that did not constitute actionable inducement.  The letter did not state that Superior Silica would not do business with Wildcat if Wildcat continued to do business with MDSC. The letter merely states that Superior Silica would not enter a contract with Wildcat until Superior Silica received assurance that Wildcat's existing contracts did not prevent such a contract.  In this circumstance, the law did not require that Superior Silica continue its negotiation with Wildcat and thereby expose itself to a potential claim for tortious interference.

### C.   COUNT II DOES NOT STATE A CLAIM BECAUSE THERE IS NO CAUSE OF ACTION FOR AIDING AND ABETTING A BREACH OF CONTRACT

Count II alleges variously that H&W aided and abetted Wildcat (Complaint ¶¶ 36, 37) and Superior Silica (Complaint ¶ 33) to terminate their respective contracts.  But a civil claim for aiding and abetting requires proof, among other elements, that the defendant undertook "conduct that as a matter of objective fact aids another in the commission of an unlawful act . . . ." *Tensfeld*, 768 N.W.2d at 649 n.12, *citing Winslow v. Brown*, 371 N.W.2d 417 (Wis. Ct. App. 1985).  An "unlawful act" for purposes of this cause of action is a crime, tort, or violation of

other prohibitory law.   It does not include a mere breach of contract.  *Spacesaver Corp. v. Marvel Group, Inc.*, 621 F. Supp. 2d 659, 665 (W.D. Wis. 2009) (dismissing plaintiff's claim for aiding and abetting a breach of contract); *see also Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 413 (7th Cir. 2000) (affirming dismissal of claim for aiding and abetting breach of contract, noting that the court could find no such cause of action in Illinois law and that Restatement (Second) of Torts § 876 does not support such a claim because "a breach of contract is not a tortious act").

The complaint does not allege that Wildcat committed an unlawful act.  It alleges that H&W "aided and abetted Wildcat in terminating their existing contract with MDSC."  Complaint ¶¶ 36, 37.  Wildcat's termination of its own contract, however, is not a crime, tort, or violation of other prohibitory law.  *Joseph P. Caulfield & Assoc., Inc. v. Litho Productions, Inc.*, 155 F.3d 883, 889 (7th Cir. 1998) ("a party cannot interfere tortiously with its own contract"), *citing Wausau Medical Center, S.C. v. Asplund*, 514 N.W.2d 34, 44 (Wis. Ct. App. 1994).  Indeed, the Complaint does not even allege that the termination breached the Wildcat-MDSC contract.  As a matter of law, therefore, H&W cannot be liable for aiding and abetting Wildcat's termination of its contract with MDSC.

Nor can liability be derived from Superior Silica's alleged conduct.  The complaint alleges that H&W aided and abetted Superior Silica's effort "to cut MDSC out of the supply chain."  Complaint ¶ 33.  But the Complaint does not allege that Superior Silica's termination of its contract with MDSC was unlawful, nor could it because at worst the termination would be a mere breach of contract.

In sum, Count II alleges no wrongful conduct that H&W allegedly aided and abetted.

### D.   COUNT III DOES NOT STATE A CONSPIRACY CLAIM BECAUSE IT DOES NOT ALLEGE THAT H&W ACTED FOR ITS OWN PURPOSE OR WITH INTENT TO HARM MDSC

Count III purports to allege a civil conspiracy under Wis. Stat. § 134.01 between Superior Silica and its attorneys H&W to tortiously interfere with MDSC's contract with Wildcat. This count fails to state a claim against H&W for two reasons: (1) an agent, such as an attorney, cannot conspire with its principal; and (2) the Complaint fails to allege, and could not plausibly allege, that H&W acted with intent to harm MDSC, as is required to state a claim for conspiracy.

First, under Wisconsin law, a company cannot conspire with its agents. *Wausau Medical Center*, 514 N.W.2d at 44; *Elbe v. Wausau Hosp. Center*, 606 F. Supp. 1491, 1502 (W.D. Wis. 1985) (holding that for civil conspiracy and § 134.01, "a corporation cannot conspire with itself and . . . the acts of an agent are the acts of the corporation"). And where plaintiffs fail to allege that the acts of the agent were wholly unrelated to promoting the principal's welfare, a claim of conspiracy does not lie. *Fraidin v. Weitzman*, 611 A.2d 1046, 1079 (Md. Ct. Special App. 1992) ("there can be no conspiracy when an attorney acts within the scope of his employment"). MDSC's complaint contains no allegation that H&W was engaged in acts "wholly unrelated to promoting" its client's welfare. In the absence of such an allegation, MDSC has not stated a claim and this Count should be dismissed.

MDSC's bald allegation that, "[b]ased upon information and belief, Hunton's demand that Wildcat terminate its contract was MDSC, the Wildcat Contract, was done without authority from Superior,"  Complaint ¶ 21, does not suffice. In view of MDSC's allegations that H&W was "pervasively involved" and acting in "collective collusion" with its client, this allegation would be implausible even if MDSC alleged any facts to support the allegation.  But in any event, MDSC's affirmative allegation that H&W's actions were undertaken "to the benefit" of its

client lays to rest any suggestion that any alleged unauthorized actions by H&W were unrelated to promoting Superior Silica's welfare.

Second, Count III also fails because it does not allege that H&W and its alleged co-conspirators acted against MDSC for the sole and specific purpose of harming MDSC. Claims of conspiracy must be premised on acts done "maliciously."  The required malice does not include "competition that incidentally harms another when the purpose is to improve one's competitive advantage," *Maleki v. Fine-Lando Clinic Chartered, S.C.*, 469 N.W.2d 629, 634 (Wis. 1991).  It encompasses only "conduct intended to cause harm for harm's sake."  *Id.*; *Joseph P. Caulfield & Assoc., Inc. v. Litho Productions, Inc.*, 155 F.3d 883, 889 (7th Cir. 1998) ("In Wisconsin, 'there can be no conspiracy' unless all conspirators act with 'malice,' meaning they must 'intend[] to cause harm for harm's sake'"), *citing Maleki*, 469 N.W.2d at 634; *Select Creations, Inc. v. Paliafito America, Inc*., 828 F.Supp. 1301 (E.D. Wis. 1992).  "[I]f it appears that the defendants' purpose was solely to protect their own interests, … then the conspiracy falls from the purview of sec. 134.01."  *Radue v. Dill*, 246 N.W.2d 507, 511 (1976).

Apart from the bare allegation that H&W acted "maliciously," Complaint ¶ 51, MDSC has not alleged that H&W and its claimed co-conspirator acted for the purpose of harming MDSC, much less alleged facts to support such a claim.  To the contrary, MDSC expressly alleges that H&W engaged in the alleged acts "to the benefit of their firm and their client, Superior."  Complaint ¶ 37.  A "purpose to improve one's competitive advantage does not run afoul of conspiracy laws if there is not a malicious motive."  *Maleki*, 469 N.W.2d at 87 n.9. MDSC's allegation that H&W acted to its client's benefit for competitive advantage makes plain that the alleged conspirators acted "to protect their own interest" and puts MDSC's claims squarely outside Wisconsin's  requirements for a viable claim of conspiracy.

## V.      CONCLUSION

For the reasons discussed above, the Complaint does not state a claim on which relief can be granted.  This Court should dismiss the Complaint against H&W with costs.

Dated this 27th day of August, 2010.

HUNTON & WILLIAMS LLP,

By its attorneys,

/s/ *Lester A. Pines*                                    .
Lester A. Pines, SBN 01016543
Lawyers for Defendants
CULLEN WESTON PINES & BACH LLP
122 West Washington Ave., Suite 900
Madison, WI 53703
Telephone: (608) 251-0101
Facsimile:  (608) 251-2883
Email: pines@cwpb.com

Robert M. Rolfe (VSB# 15779)
HUNTON & WILLIAMS LLP
Riverfront Plaza-East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Phone: (804) 788-8466
Fax:    (804) 343-4568
Email: rrolfe@hunton.com

Counsel for Hunton & Williams LLP

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2010, I caused a copy of HUNTON & WILLIAMS LLP'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS to be delivered by first class mail, postage prepaid, to:

> Albert Solochek, Esq.
> HOWARD SOLOCHEK & WEBER, S.C.
> 324 E. Wisconsin Avenue, Suite 1100
> Milwaukee, Wisconsin 53202
>
> Daniel F. Konicek, Esq.
> KONICEK & DILLON, P.C.
> 21 West State Street
> Geneva, Illinois 60134
>
> Counsel to Minerals Development & Supply Company, Inc.

> HUNTON & WILLIAMS LLP,
>
> By its attorneys,
>
> /s/ *Lester A. Pines*                          .
> Lester A. Pines, SBN 01016543
> Lawyers for Defendants
> CULLEN WESTON PINES & BACH LLP
> 122 West Washington Ave., Suite 900
> Madison, WI 53703
> Telephone: (608) 251-0101
> Facsimile:  (608) 251-2883
> Email: pines@cwpb.com